# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| NOTTINGHAM-SPIRK DESIGN ASSOCIATES, INC., | ) | Case No. 1:21-cv-00341 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Thomas M. Parker |
| | ) | |
| HALO INNOVATIONS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>AMENDED OPINION AND ORDER</u>

Plaintiff Nottingham-Spirk Design Associates, Inc. worked with Defendant Halo Innovations, Inc. to develop a sleep product for infants and children. That collaboration resulted in a successful product that generated royalties for Nottingham-Spirk. In 2020, those royalty payments dropped off, prompting this dispute between the parties. Both Nottingham-Spirk and Halo Innovations move for judgment as a matter of law on Plaintiff's breach of contract claim. For the following reasons, the Court **GRANTS IN PART** Plaintiff's motion (ECF No. 39) and **DENIES** Defendant's motion (ECF No. 38).

## STATEMENT OF FACTS

Nottingham-Spirk Design Associates, Inc. is an Ohio corporation that partners with other companies to develop new products in the consumer, healthcare, and business sectors. (ECF No. 19, ¶ 9, PageID #140.) Halo Innovations, Inc. manufactures a product called the Halo BassiNest® Swivel Sleeper. (ECF No. 19, ¶ 10; ECF No. 25, ¶ 10, PageID #219.)

### A.     The 2010 Proposal and 2012 Amendment

Before 2010, Halo Innovations did not sell a bassinet product. (ECF No. 19, ¶ 21, PageID #143; ECF No. 25, ¶ 21, PageID #221.)  Nottingham-Spirk claims that Halo Innovations approached it in 2010 to seek its "expertise in developing the next generation of consumer sleep products to be offered by Halo." (ECF No. 19, ¶ 22.) Then, in November 2010, Nottingham-Spirk sent Halo Innovations a document titled "Strategic Innovation Program for Developing the Next Generation of Sleep Products." (ECF No. 19-1, PageID # 160; ECF No. 39-2, PageID #542.)

That 2010 document presents a memorandum proposal from Nottingham-Spirk to Halo Innovations. (ECF No. 19-1, PageID #161.)  In part, the document makes "a proposal for an Innovation Program that provides a format for working together on a number of strategic adult and infant product categories" and "outlines how we could structure a working relationship to identify and develop unique new product opportunities." (*Id.*; *see also* ECF No. 39-2, PageID #542.)  To that end, the proposal provides for a "reduced-fee development retainer" to be "paid on the first of each month for a period of six months" and "automatically renewed for successive 6-month periods unless revised in writing by either party at least 30 days before the end of each period." (ECF No. 19-1, PageID #163.)

The 2010 proposal also includes provisions regarding licensing, royalties, and patents. (*Id.*)  In the event "the product is licensed to a 3rd party," the document provides that Nottingham-Spirk "will help negotiate a licensing contract with the potential customer" and that "[a]ny licensing income will be split with 2/3 paid to Halo and 1/3 paid to [Nottingham-Spirk]." (*Id.*)  Further, the proposal provides that

2

"[a]ll parties will sign an industry-standard licensing/royalty contract prior to market entry" and, "[i]f the product is manufactured and sold directly to retail, Halo shall pay [Nottingham-Spirk] a royalty of 4%, based on the net selling cost, for the life of the products."  (*Id.*)  As for intellectual property, the proposal confirms Halo Innovations' ownership of technology and further product developments:  "Halo will file for, own and maintain all patents relative to the technology, process, further developments and newly developed product concepts."  (*Id.*)

On November 10, 2010, both parties signed the proposal.  (ECF No. 19-1, PageID #164.)

In December 2012, the parties executed a one-page amendment to the 2010 Strategic Innovation Program.  (ECF No. 19-2.)  Halo Innovations drafted the amendment, which Nottingham-Spirk "accepted and agreed to."  (*Id.*, PageID #169.)  The 2012 amendment refers to the 2010 agreement as "our Strategic Innovation Program Contract" and changes the royalty payable under the 2010 proposal.  (*Id.*)  Halo Innovations negotiated with an inventor who developed a similar patent-pending product to the BassiNest® Swivel Sleeper and agreed to royalty payments to her.  (*Id.*)  Nottingham-Spirk agreed to share the royalty with Halo Innovations "on a 50/50 basis," such that the royalty due to Nottingham-Spirk "on this product will be 3.5% for the first two years and 3% thereafter."  (*Id.*)

### B.    The Halo BassiNest®

As a result of Nottingham-Spirk's collaboration with Halo Innovations, the Halo BassiNest® Swivel Sleeper, depicted below, was introduced to consumers in 2014.

3



(ECF No. 19, ¶¶ 47–48, PageID #147.)  At the time, the Swivel Sleeper offered several desirable features compared to other bassinets:  360-degree rotation; a lowering bedside wall; mesh walls, a height-adjustable base, firm surface, and hourglass shaped sidewall.  (*Id.*, ¶ 46; ECF No. 39-3, PageID #551.)

### C.    Other Halo Innovations Bassinet Products

Later, Halo Innovations began offering additional bassinets.  (ECF No. 19, ¶ 59, PageID  #148; ECF No. 25, ¶ 59, PageID #226.)  In May 2018, Halo Innovations announced that it "will be adding to their Bassinest line a new Essentia and Premiere model."  (*Id.* ¶ 60, PageID #149; ECF No. 39-3, PageID  #546.)  Like the 2014 swivel sleeper, the Essentia and Premiere products include a lowering bedside wall, 360-degree rotation, and mesh sides.  (ECF No. 19, ¶ 61, PageID #149; ECF No. 25, ¶¶ 60 & 61, PageID #226–27; ECF No. 39-3, PageID #546.)  Between 2016 and 2018, Halo Innovations launched the BassiNest® Twin Sleeper, the BassiNest® Hospital

Sleeper, and the BassiNest® Glide Sleeper with some features similar to those of the 2014 swivel sleeper.  (ECF No. 19, ¶¶ 62–64, PageID #150–51; ECF No. 25, ¶¶ 62–64; ECF No. 40-1, ¶¶ 6, 8, 10, PageID #579.)

In January 2020, Halo introduced the "New and Enhanced Halo® BassiNest®," announcing in a press release that it includes "several new product enhancements to its award-winning HALO® BassiNest® swivel sleeper."  (ECF No. 19, ¶ 66, PageID #152; ECF No. 25, ¶ 66, PageID #228; ECF No. 39-3, PageID #548.)  The new bassinet includes the "core features" of the 2014 model, including 360-degree swivel, a lowering bedside wall, mesh walls, a height-adjustable base, and a firm surface.  (ECF No. 39-3, PageID #551.)

### D.    Patents and Trademarks

Halo Innovations obtained two patents related to its BassiNest® products: U.S. Patent No. 9,962,012 (ECF No. 38-3) and U.S. Patent D751,847 (ECF No. 38-4). The '012 patent was filed December 27, 2013 and issued May 8, 2018.  (ECF No. 38-3, PageID #440.)  It lists Halo Innovations as the sole applicant and assignee.  (*Id.*)  The '847 patent, for an "upper bumper and sleep platform of a bassinet," was filed on May 2, 2014 and issued on March 22, 2016.  (ECF No. 38-4, PageID #458.)  It is (*Id.*) It also lists Halo Innovations as the sole applicant and assignee.  (*Id.*)

Halo Innovations also registered two trademarks, one for Halo® Bassinest on July 21, 2015 (ECF No. 38-5), and another for BassiNest® on December 30, 2014 (ECF No. 38-6).

### E.    Royalty Payments

In January 2021, Nottingham-Spirk sent a letter to Halo Innovations raising concerns related to Halo Innovations' royalty payments to Nottingham-Spirk under the 2010 agreement.  (*See generally* ECF No. 38-7.)  In the letter, Nottingham-Spirk claims it received the following royalties from Halo Innovations:

| Year | Royalties Paid ($) |
|------|--------------------|
| 2014 | 26,014 |
| 2015 | 246,214 |
| 2016 | 312,424 |
| 2017 | 400,348 |
| 2018 | 442,648 |
| 2019 | 505,953 |
| 2020 | 222,560 |

(*Id.*, PageID #472.)    Halo Innovations responded that the royalties paid to Nottingham-Spirk decreased in 2020 because Halo Innovations "launched new products in 2019 and phased out old products developed with [Nottingham-Spirk]." (ECF No. 39-2, PageID #541.)  According to records from Aden & Anais, Inc., the parent company of Halo Innovations, Halo Innovations has not paid Nottingham-Spirk any royalties on sales of BassiNest® Hospital, BassiNest® Glide, or BassiNest® Twin Sleeper.  (ECF No. 40-1, ¶¶ 7, 9, 11, PageID #579.)

### STATEMENT OF THE CASE

Plaintiff's amended complaint names as Defendants:  Halo Innovations, Aden & Anais, Swander Pace Capital, LLC, Swander Pace Capital V, LP, and Swander

6

Pace Vapital VI, LP.  (ECF No. 19.)  In a separate order, the Court addressed the pending motions to dismiss Defendants other than Halo Innovations filed.  (ECF No. 42.)

Plaintiff's amended complaint asserts three counts:  breach of contract (Count I), quantum meruit/unjust enrichment (Count II), and accounting (Count III).  (ECF No. 19, ¶¶ 76–94, PageID #155–57.)  At the initial case management conference, the Court directed the parties to propose either (1) a briefing schedule to resolve threshold legal issues of contract interpretation; or (2) a schedule for the exchange of limited discovery necessary for early summary judgment on the contractual issues.  (Minute Order, June 28, 2021.)  At the direction of the Court, the parties agreed to a briefing schedule.  (Case Management Plan & Scheduling Order, July 16, 2021.)  According to that schedule, Defendant moved for judgment on the pleadings or, alternatively, summary judgment.  (ECF No. 38.)  Plaintiff filed a cross motion for judgment on the pleadings or, alternatively, summary judgment.  (ECF No. 39.)

## GOVERNING LEGAL STANDARD

Generally, a Rule 12(c) motion for judgment on the pleadings is decided using the same standard as a motion to dismiss under Rule 12(b)(6).  *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020) (citing *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014)).  But "if matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  At the pleading stage, the Court's inquiry is limited to the content of the complaint, although it may also consider

matters of public record, items appearing in the record of the case, and exhibits attached to or made part of the complaint. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001). In this regard, most of the materials the parties include in the record at this stage of the proceedings constitutes matter referred to in the amended complaint or central to the parties' respective claims and defenses. *See DeShetler v. FCA US LLC*, No. 3:18 CV 78, 2018 WL 6257377, at *4 (N.D. Ohio Nov. 30, 2018) (quoting *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016)).

In their motions, the parties present some limited matters that go beyond the pleadings. Factually, the parties do not dispute these items—for example, the fact that correspondence said certain things or the like—though they have competing views of their legal significance. For the most part, the Court has disregarded these items and not considered them. However, out of an abundance of caution, the Court considers the record presented under Rule 56, under which summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, the movant is entitled to summary judgment if the nonmoving party failed to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Ultimately, the Court must determine whether "one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

"[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).  Therefore, cross-motions for summary judgment do not warrant granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.  *Langston v. Charter Twp. of Redford*, 623 F. App'x 749, 755 (6th Cir. 2015).

## REQUEST FOR ORAL ARGUMENT

Before turning to the merits, the Court briefly addresses one additional procedural consideration.  At the conclusion of its reply Defendant requested oral argument.  (ECF No. 40, PageID # 575.)  Upon review of the record and the parties' briefs, the Court finds that oral argument is not necessary for resolution of the pending motions.  The parties' respective briefs were thorough and helpful, and oral argument would not provide sufficient benefits in clarifying the facts, the law, or the parties' arguments that outweigh the various costs of oral argument.  Nor does Defendant certify, pursuant to the Court's Civil Standing Order, that a less experienced lawyer would make the argument, in which case the Court would grant oral argument as of right.

## ANALYSIS

At bottom, the parties' dispute turns on matters of contract interpretation, which presents a question of law.  *Asset Mgmt. One LLC v. U.S. Bank Nat'l Ass'n*, 569

9

F. App'x 438, 442 (6th Cir. 2014); *Blair v. McDonagh*, 177 Ohio App. 3d 262, 278, 2008-Ohio-3698, 894 N.E.2d 377, 388, ¶ 48.  Two questions in particular lie at the heart of the dispute:  (1) whether Nottingham-Spirk is entitled to royalties from Halo Innovations; and (2) if so, whether those royalties extend to products other than the Halo Bassinest® Swivel Sleeper rolled out in July 2014.

## I.     Contract or Agreement to Agree

Defendant argues that Plaintiff is not entitled to royalties because the 2010 proposal is not an enforceable contract but merely an agreement to agree.  (ECF No. 38-1, PageID #426.)  Defendant claims that any formal contract contemplated in the 2010 proposal was contingent on later negotiation of material terms in a future licensing and royalty agreement, and one was never executed.  (*Id.*, PageID #426–27.)  Plaintiff responds that the 2010 proposal is an enforceable contract.  (ECF No. 39-1, PageID #523.)

Under Ohio law, which the parties agree applies, "contract formation requires 'mutual assent (generally, offer and acceptance) and consideration.  The plaintiff must also show . . . a meeting of the minds and that the contract was definite as to its essential terms.'" *Faurecia Auto. Seating, Inc. v. Toledo Tool & Die Co., Inc.*, 579 F. Supp. 2d 967, 971 (N.D. Ohio 2008) (quoting *Nilavar v. Osborn*, 127 Ohio App. 3d 1, 12–13, 711 N.E.2d 726, 732 (Ohio Ct App. 1998)).  The parties dispute whether there was a meeting of the minds and certainty with respect to the essential terms. (ECF No. 40, PageID #560; ECF No. 41, PageID #602.)

10

### I.A.    Meeting of the Minds and Essential Terms

To determine whether a valid contract exists, the Court gives "effect to the parties' intent, which can be found in the language they choose to employ.  The court should read the contract as a whole and gather the intent of each party from the whole."  *Blair*, 2008-Ohio-3698, ¶ 49 (citation omitted).  In doing so, the Court presumes the written agreement reflects the parties' intent.  *Patel v. Strategic Grp., L.L.C.*, 2020-Ohio-4990, 161 N.E.3d 42, ¶ 35 (Ohio Ct. App.).  "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 314, 1996-Ohio-393, 667 N.E.2d 949 (1996).

Here, the "Licensing/Royalty" provision of the 2010 proposal provides that "[i]f the product is manufactured and sold directly to retail, Halo shall pay [Nottingham-Spirk] a royalty of 4%, based on the net selling cost, for the life of the products."  (ECF No. 19-1, PageID #163.)  But the prior sentence provides that "[a]ll parties will sign an industry-standard licensing/royalty contract prior to market entry."  (*Id.*)  Notwithstanding the parties' expressed intent to sign an industry-standard licensing/royalty contract later, the terms of the 2010 proposal are sufficiently definite and specific about the terms of payment, the duration of royalty payments, and the conditions precedent to payment of royalties to represent a meeting of the minds on these terms.

Moreover, the 2012 amendment confirms that the parties intended to be bound to the royalty provision.  Not only did the 2012 amendment refer to the 2010 proposal as a "contract," but it also amended the royalty agreement.  (ECF No. 19-2.)  Further,

it demonstrates that, if the parties wanted to terminate the agreement, they knew how to do so—even without an industry-standard licensing/royalty agreement.  "[I]f it is found that the parties intended to be bound, the court should not frustrate this intention, if it is reasonably possible to fill in some gaps that the parties have left, and reach a fair and just result."  *Schafer v. Soderberg & Schafer*, 196 Ohio App. 3d 458, 476, 2011-Ohio-4687, ¶ 74, 964 N.E.2d 24, 38 (quotation omitted).  Such is the case here.

### I.B.    Defendant's Arguments

To avoid the conclusion that the parties have an enforceable contract, Defendant argues that the 2010 proposal fails for lack of definiteness because any agreement did not include all of the essential terms as Ohio law requires.  Under Defendant's argument, two fundamental flaws preclude the 2010 proposal from operating as a binding contract:  (1) the parties did not define key terms in the royalty agreement—such as the product, duration, and scope of royalties; and (2) the reference to an "industry-standard licensing/royalty contract" contemplates further action by the parties before the parties have a binding contract.  (ECF No. 38-1, PageID #426–27; ECF No. 40, PageID # 563–65.)  For these reasons, Defendant sees the 2010 proposal as an agreement to agree rather than an enforceable contract. (ECF No. 38-1, PageID #426.)

### I.B.1. Key Terms

Although the 2010 proposal does not define the term "product," this fact does not mean that a meeting of the minds did not occur.  "Ohio law does not require contracting parties to share a subjective meeting of the mind to establish a valid

contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time." *216 Jamaica Ave., LLC v. S&R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008).  Indeed, the 2010 proposal sufficiently identifies the object of the parties' agreement, including the products to which it applies.

Defendant relies on the Fifth Circuit's decision in *Liberto v. D.F. Staugger Biscuit Co.*, 441 F.3d 318 (5th Cir. 2006).  There, the court held that a settlement, which granted an exclusive license, was an unenforceable agreement to agree.  *Id.* at 324.  The court reasoned that the settlement agreement neither mentioned the duration of the license nor the grounds for its termination and that the time of performance was not manifested in the agreement.  *Id.*

Setting aside the fact that *Liberto* applied Texas law, that case does not support Defendant's position.  Unlike the settlement agreement in *Liberto*, the 2010 proposal contained the duration of the royalty payment ("for the life of the products") and the royalty payment's scope ("4% based on net selling cost").  (ECF No. 19-2.) Based on the plain language, it is more than an agreement to agree; even though the parties also agreed to sign an industry-standard licensing/royalty agreement.  These terms are sufficiently definite, and a refusal to enforce them would result in rewriting the agreement, which the Court may not do.  "If the terms of the written instrument are clear and unambiguous, courts must give the words their plain and ordinary meaning and may not create a new contract by finding the parties intended

13

something not set out in the contract."  *Tomechko v. Garrett*, 2021-Ohio-1377, ¶ 33, 172 N.E.3d 1087, 1095 (Ohio Ct. App.) (citation omitted).

### I.B.2. Industry-Standard Licensing/Royalty Contract

Nor does the reference to an "industry-standard licensing/royalty contract" necessarily contemplate or require further action by the parties before they have a binding contract for royalties.  When interpreting a written agreement, "[t]he [C]ourt must read words and phrases in context and apply the rules of grammar and common usage."  *Gahanna v. Ohio Mun. Joint Self-Ins. Pool*, 2021-Ohio-445, ¶ 12, 168 N.E.3d 58, 62.  In its entirety, the language at the heart of the dispute provides:

> If the product is licensed to a 3rd party, [Nottingham-Spirk] will help negotiate a licensing contract with the potential customer with final terms subject to Halo's approval.  Any licensing income will be split with 2/3 paid to Halo and 1/3 paid to [Nottingham-Spirk].  All parties will sign an industry-standard licensing/royalty contract prior to market entry.  If the product is manufactured and sold directly to retail, Halo shall pay [Nottingham-Spirk] a royalty of 4% based on the net selling cost, for the life of the products.  If the product, developed technology or brands associated with the newly developed items are sold to an outside company, the agreed-to terms shall transfer to the new owner.

(ECF No. 19-1, PageID # 163.)  Reading this paragraph as a whole shows that the language on which Defendant relies—that the parties will sign an industry-standard licensing/royalty agreement—applies to Nottingham-Spirk, Halo Innovations, *and* any third-party to which a product is licensed.  The next sentence, including the 4% royalty, later modified in the 2012 amendment, governs products Halo Innovations brings directly to market.

14

A later reference in the 2010 proposal to the "standard agreement" does not change this conclusion.  That second provision appears under the heading "Patents, Intellectual Property and Know-how."  In its entirety, it provides:

> Halo will file for, own and maintain all patents relative to the technology, process, further developments and newly developed product concepts.  Developed patent rights will be assigned to Halo after proper payment of completed development steps and signing of the standard agreement.

(ECF No. 19-1, PageID #163.)  Based on this paragraph, Halo Innovations contends that "[i]t cannot be true both that a Standard Agreement need only be signed when there is a third-party licensee <u>and</u> that Halo and Nottingham must sign a Standard Agreement before Nottingham transfers its patent rights to Halo, regardless of whether there is a third-party licensee."  (ECF No. 45-1, PageID #670.)  In other words, Defendant reads "the standard agreement" referenced here as the same "industry-standard licensing/royalty contract" referenced earlier in the 2010 proposal.

Assuming Defendant correctly reads these different words to mean the same things, a textually doubtful proposition, Defendant's argument fails because it blurs the purpose and effect of two separate provisions of the 2010 proposal that serve different ends.  In the earlier royalty provision, "[i]f the product is manufactured and sold directly to retail, Halo shall pay [Nottingham-Spirk] a royalty."  There is no requirement here for an industry-standard contract—simply a promise to pay.  The industry-standard language on which Defendant relies appears in a condition that applies where a third-party is involved.  The patent provision addresses a different

circumstance entirely—the development of intellectual property, without regard to taking that intellectual property to market directly or with a third-party.

At bottom, basic rules of contract interpretation preclude reading the 2010 proposal to require execution of a separate industry-standard licensing/royalty agreement before Halo Innovations and Nottingham-Spirk have a valid contract for the payment of royalties. In any event, the 2012 amendment confirms the intent of the parties to be bound.

## II.  Other Product Lines

Concluding that Halo Innovations and Nottingham-Spirk have a contract raises the question of the products to which the 2010 proposal and the 2012 amendment apply. Defendant argues that the royalty payment should be restricted to sales from the Halo Bassinest® Swivel Sleeper, rolled out in July 2014. (ECF No. 38-1, PageID #429–30; ECF No. 40, PageID #8–9.) Plaintiff argues that the royalty payment extends to the entire Halo® Bassinest® Swivel Sleeper product line. (ECF No. 39-1, PageID #530—31; ECF No. 41, PageID #615.)

"The interpretation of written contracts, including any assessment as to whether a contract is ambiguous is a question of law." *Envision Waste Servs., LLC v. County of Medina*, 2017-Ohio-351, ¶ 15, 83 N.E.3d 270, 275 (cleaned up). Again, the Court's role is to ascertain the intent of the parties. *Id.* "Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313–14, 1996-Ohio-393, 667 N.E.2d 949, 952 (citing *Shifrin v. Forest City Enters., Inc.*, 64

16

Ohio St. 3d 635, 637, 1992-Ohio-28, 597 N.E.2d 499, 501).  "Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement."  *Covington v. Lucia*, 151 Ohio App. 3d 409, 414, 2003-Ohio-346, ¶ 18, 784 N.E.2d 186, 190 (Ohio Ct. App.).

## II.A.  Products to Which the 2010 Proposal Applies

Here, Plaintiff asserts that the text of the 2010 proposal, along with the extrinsic evidence, indicates that the subject of the royalty provision extends to more than one specific product.  (ECF No. 39-1, PageID #532.)  Specifically, Plaintiff argues that the objective of the parties' relationship, as stated in the 2010 proposal, was to develop "the next generation of sleep products"—"products," plural, and generation implying more than a single product  (*Id.*)  Further, Plaintiff argues that it is entitled to royalties from newer models of the Halo Bassinest® Swivel Sleeper because they derive from the same patented design features as the product that Halo Innovations launched with Nottingham-Spirk in 2014.  (*Id.*, PageID #534–36.)  In other words, the newer models are commercial embodiments of the inventions claimed in the '012 and '847 patent to which Nottingham-Spirk is entitled royalties.  (*Id.*, PageID #536.)  The Court agrees.

The structure of the 2010 proposal identifies the parties' intent.  The proposal is titled:  "Strategic Innovation Program for Developing the Next Generation of Sleep Products."  (ECF No. 19-1, PageID #160.)  Further, several sections of the 2010 proposal refer to "products" rather than a single product or even a specific product

17

model.  (*Id.*, PageID #162, #163 & #164.)  Viewing the 2010 proposal as a whole, the term "product" is not limited to one specific model of one specific product; it includes other products included within the Halo BassiNest® Swivel Sleeper product line.

Defendant's argument for a restrictive reading of the term product fails as a matter of law for at least two reasons.  *First*, Defendant argues that the term "product" is ambiguous because the 2010 proposal does not define it; therefore, the term should be limited to a single product, the Halo BassiNest® Swivel Sleeper.  (ECF No. 38-1, PageID #431.)  But the 2010 proposal contains language expressly embracing multiple products, not a single product.  For example, the 2010 proposal references collaboration on "a number of . . . product categories . . . to identify and develop unique new product opportunities."  (ECF No. 19-1, PageID #161.)  It repeatedly refers to developing "products," "a sustainable stream of new product innovations," and "continuous improvement and development" and the like.  (*Id.*, PageID # 162.)  This language in the parties' agreement shows that the parties did not intend to limit the product covered under their agreement as narrowly as Defendant contends.

*Second*, Defendant argues that, absent specific language in the 2010 proposal defining the term product, "the royalty obligation cannot reach beyond the 2014 [Halo BassiNest® Swivel Sleeper] without interfering with Halo's explicit rights as the owner of the '012 and '847 patents, which cover many products other than the 2014 [Halo® BassiNest® Swivel Sleeper]."  (ECF No. 38-1, PageID #431–32; *see also* ECF No. 40, PageID #568.)  But this argument extends far beyond the language of the

18

2010 proposal and 2012 amendment.  Those agreements provide for royalty payments without respect to the '012 and '847 patents.

Nothing about these agreements ties royalty payments to the patent rights of Halo Innovations.  The 2010 proposal provides that "Halo will file for, own and maintain all patents relative to the technology, process, further developments and newly developed product concepts.  Developed patent rights will be assigned to Halo after proper payment of completed development steps and signing of the standard agreement." (ECF No. 19-1, PageID #163.)  Nottingham-Spirk assigned its rights in the '012 and '847 patents to Halo Innovations.  (ECF No. 25, ¶¶ 51 & 54, PageID #225–26.) To the extent that new products incorporate the patent rights Nottingham-Spirk assigned to Halo Innovations, the parties' agreements do not limit the payment of royalties as Defendant contends.  Mere improvements to a product "do not change the fact that the resulting product fits the definition of the original invention." Z*ila, Inc. v. Tinnell*, 502 F.3d 1014, 1025 (9th Cir. 2007).

Accordingly, Defendant's effort to limit the reach of the "product" at issue fails as a matter of law based on the plain language of the parties' agreements.  No genuine dispute of material fact exists over whether the royalty payment extends to sales from the Halo Bassinest® Swivel Sleeper product line.

## II.B.  Date of the Royalty Adjustment

Finally, the parties disagree about when the royalty adjustment period in the 2012 amendment begins.  Defendant negotiated with an inventor who developed a similar patent-pending product to the BassiNest® Swivel Sleeper and agreed to

royalty payments to her.  (ECF No. 19-2.)  This dispute turns on interpretation of the 2012 amendment, which provides in relevant part:

> As I had mentioned a few weeks ago, Halo was negotiating a Patent Licensing and Royalty Agreement with an Inventor, Patricia Long, in connection with a patent-pending technology for a similar hospital product that included a side wall that lowered and returned to allow for easier access to the infant.  We've concluded the negotiations with the inventor and have signed the attached agreement which calls for royalty payments to her of 1% of net sales for the first two years and 2% for subsequent years.
>
> As we discussed a few weeks ago, you agreed to share in this royalty on a 50/50 basis with Halo such that the royalty due to Nottingham-Spirk on this product will be 3.5% for the first two years and 3% thereafter.

(*Id.*, PageID #169.)

Defendant argues that the 2012 amendment must be read in conjunction with the license and royalty agreement between Defendant and the inventor.  (ECF No. 40, PageID #573–74.)  Under Defendant's argument, the 3.5% royalty obligation applied for two years beginning in April 2013, when the inventor's patent issued.  (*Id.*, PageID #574; ECF No. 38-8.)  Under this argument, because the BassiNest® Swivel Sleeper launched in July 2014, Plaintiff is only entitled to 3.5% royalties for a nine-month period, and Defendant's obligation to pay Plaintiff royalties at the rate of 3.5% ceased in April 2015.  (ECF No. 40, PageID #574.)  In response, Plaintiff argues that the plain language of the 2010 proposal and the 2012 amendment provides for a 3.5% royalty payment starting on the date when the BassiNest® Swivel Sleeper launched in July 2014.  (ECF No. 41, PageID #617.)

On the face of the 2012 amendment, the 3.5% royalty is tied to "this royalty"— the one paid to the inventor—on "this product"—the one(s) that are the subject of the

contract with the inventor, which is the subject of the amendment.  Further, each agreement uses a two-year window for the payment of royalties at different rates. Two questions arise from the interplay of these agreements:  (1) whether the two-year period in each agreement covers the same period of time; and (2) the time when the two-year period begins to run.

With respect to the first question, the 2012 amendment ties the 3.5% royalty to Nottingham-Spirk "on this product" to "the first two years."  Because the 2012 amendment attached the royalty agreement with the inventor, and textually refers in adjacent sentences to payment of royalties during "the first two years," the 2012 amendment makes clear that each agreement refers to the same two years.

According to the royalty agreement with the inventor, royalty payments begin "after the issuance of the Letters Patent described in in definition (a) which are covered by the current application for the Patent."  (ECF No. 40-5, ¶ 3, PageID #593.) Although the agreement cross-references the definition of the term "Consumer Market" in definition (a), not the definition of Letters Patent as referenced in Paragraph 3, royalties plainly begin with "the issuance of the Letters Patent."  Even setting aside the cross-reference in Paragraph 3, the agreement between Halo Innovations and the inventor leaves little doubt that royalty payments begin when letters patent issue.  Indeed, Paragraph 3 embodies an agreement to pay royalties "in each of the first two Fiscal Years" beginning after the letters patent issue (*id*.), and a "Fiscal Year" begins with the first day of the month in which letters patent issue (*id.*, definition (h), PageID #592).

Further, other provisions of the royalty agreement with the inventor reinforce the conclusion that the payment of royalties ties to the issuance of letters patent.  For example, Paragraph 3 goes on to provide for payment of provisional royalties that cover the time period from the execution of the royalty agreement and the issuance of letters patent.  (*Id.*)  And the issuance of letters patent trigger the initial royalty payment in a provision that contemplates no royalty payment may be due, whether because no product is sold or letters patent have not yet issued.  (*Id.*, ¶ 4, PageID #593.)  Because the 2012 amendment ties the two-year period to the royalty agreement with the inventor, these provisions also tie payment of the 3.5% royalty to the same two-year period beginning with issuance of letters patent.

Finally, the 2012 amendment modifies the 2010 proposal, which provides that: "If the product is manufactured and sold directly to retail, [Defendant] shall pay [Plaintiff] a royalty of 4%, based on the net selling cost, for the life of the products." (ECF No. 19-1, PageID #163.)  Following modification of the 2010 proposal with respect to products covered in the third-party royalty agreement Halo Innovations entered on December 14, 2012, the amount of royalty payments due for covered products is 3.5% (based on net selling cost) for the first two years, beginning with the issuance of letters patent, and 3% after that.  No genuine dispute of material fact exists over the meaning of these terms.

## CONCLUSION

For the foregoing reasons, no genuine dispute of material fact exists as to whether the 2010 proposal formed a binding and enforceable contract or over the products to which that contract applies.  Therefore, the Court **DENIES** Defendant's

motion for summary judgment (ECF No. 38) and **GRANTS IN PART** Plaintiff's motion for summary judgment (ECF No. 39).

Because an enforceable contract governs the parties' relationship, the Court **DISMISSES** Plaintiff's *quantum meruit* and unjust enrichment claims (Count Two). *See Gascho v. Global Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 699 (S.D. Ohio 2012) (explaining that Ohio law does not permit a party to "seek damages under quasi-contractual theories of recovery such as a claim of unjust enrichment when a contract governs the relationship").

This disposition leaves pending Plaintiff's Count III, which seeks an accounting.

**SO ORDERED.**

Dated:  June 21, 2022

_____
   J. Philip Calabrese
   United States District Judge
   Northern District of Ohio